07 CV     6036

JUDGE SCHEINDLIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
POWERFUL KATINKA, INC.                          :
d/b/a PEARL OYSTER BAR,                          :

                              Plaintiff,        :

                                                :
    -against -                                  :

EDWARD McFARLAND and ED'S LOBSTER               :
BAR LLC,                                        :

                              Defendants.       :
-----------------------------------------------------------X

07 CV

**COMPLAINT**

JUN 2 6 2007

    1.    Plaintiff Powerful Katinka, Inc. d/b/a Pearl Oyster Bar ("Plaintiff" or "Pearl"),

by its attorneys, Schiff Hardin LLP, for its complaint against defendants Edward McFarland

("McFarland") and Ed's Lobster Bar LLC, alleges as follows:

**Introduction**

    2.    Pearl Oyster Bar is a small, critically acclaimed, seafood restaurant in lower

Manhattan. Opened in 1997, Pearl has earned an international reputation and has been praised

for its menu and ambiance in numerous publications. Every menu item, as presented at Pearl, as

well as its restaurant design, was created and developed by Pearl chef Rebecca Charles. Pearl

serves classic New England seafood dishes refined and transformed by Charles, as well as dishes

personal to chef Charles based on her two decades of experience as a head chef. Charles has

devoted substantial time, money and effort to the creation of Pearl, as more fully detailed below.

    3.    Defendant and former Pearl employee Edward McFarland wrongly has

misappropriated the good will and reputation earned by Pearl over the last decade. In bad faith,

utilizing proprietary and confidential information he secured during the six years he was

employed in a fiduciary capacity at Pearl, McFarland has opened a copycat restaurant called

"Ed's Lobster Bar." McFarland has pirated Pearl's entire menu; copied all aspects of Pearl's presentation of its dishes; duplicated Pearl's readily identifiable décor; made repeated efforts to secure Pearl's staff and suppliers and even returned to Pearl and photographed business documents; all for the evident purpose of trading off of Pearl's sterling reputation and business. Defendants' misappropriation is total, unethical and constitutes extreme commercial piracy.

**Jurisdiction and Venue**

4.      This is an action brought pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1337 (regulation of commerce), 15 U.S.C. § 1125 (Lanham Act), 28 U.S.C. §§ 2201 and 2202 (declaratory relief), and 28 U.S.C. §1367 (supplemental jurisdiction).

5.      Venue is proper in this district pursuant to 28 U.S.C. §1391 because defendants are doing business in this district and harm occurred and is occurring in this district.

**The Parties**

6.      Plaintiff Powerful Katinka, Inc., doing business as Pearl Oyster Bar, is a corporation formed and existing under the laws of the State of New York. Since 1997, Pearl has operated a unique restaurant at 18 Cornelia Street in the County and City of New York, in this district. Pearl's chef and creative force, Rebecca Charles, devised a distinctive amalgam of culinary, visual, esthetic and environmental characteristics for her restaurant, made feasible in part by use of innovations she developed through long effort ("Restaurant Identity"). As more fully described below, this distinctive Restaurant Identity has won wide recognition. It has been the subject of extensive and enthusiastic praise and commentary, in both specialized and general media. Annexed as Exhibit A are copies of illustrative examples of New York City, national and international newspaper and magazine articles attesting to Pearl's fame.

2

7.     On information and belief, defendant Edward McFarland ("McFarland") resides at 266 Tabb Avenue, Piscataway, New Jersey 08854. McFarland was the *sous chef* at Pearl and was employed from 2000 to early 2007. On information and belief, McFarland is the chef at Ed's Lobster Bar, a restaurant located in close proximity to Pearl at 222 Lafayette Street, in the City and County of New York, in this district. On information and belief, Ed's Lobster Bar opened to the public on March 16, 2007. On information and belief, McFarland also has a financial interest in defendant Ed's Lobster Bar LLC, with the same address, which owns and operates Ed's Lobster Bar.

8.     On information and belief, defendant Ed's Lobster Bar LLC is a limited liability company formed on November 6, 2006, and still existing, under the laws of the State of New York.

9.     On information and belief, investors Andrew Rasiej and Michael Weinstein also have financial interests in Ed's Lobster Bar LLC.

**Development of the Unique Pearl Oyster Bar Restaurant Identity**

10.     Rebecca Charles is a nationally recognized chef. She has earned her reputation through her endeavors in the field since 1972. She has worked at top-rated Maine and New York restaurants and is one of a handful of women chefs to own and operate a well-known New York restaurant. In 2003, Charles and Deborah DiClementi wrote "Lobster Rolls & Blueberry Pie," a critically acclaimed memoir and cookbook further establishing and extending Pearl's reputation.

11.     In his introduction to "Lobster Rolls & Blueberry Pie," celebrated author Calvin Trillin colorfully and accurately described Pearl as follows:

> If you had to make up a fairy tale that might explain Pearl, Rebecca Charles's remarkable little restaurant in Greenwich Village, I think you'd start with a genie who also happened to be a venture capitalist. Encountering the Genie through circumstances we needn't go into, Rebecca reveals her dream of opening a restaurant that strips away

3

everything that's extraneous and maybe even deleterious to enjoying terrific food in pleasant surroundings – no gaggle of assistants in the kitchen to dilute what can be controlled by the chef, no expensive table settings and giant flower arrangements soaking up money that could be used for ingredients, no maitre d' who might turn snotty if he's been rejected for yet another part off-Broadway.

12.      Charles undertook all the steps to conceive, locate, design, construct, equip, manage and operate Pearl, as well as its extensive 2003 expansion.  While on a vacation visit to San Francisco, Rebecca ate at the legendary but tiny Swan Oyster Depot and realized that it was possible to create a wonderful restaurant even on a shoestring budget in the right space and with the right menu.  Charles spent many months researching recipes, investigating purveyors, developing and refining Pearl's menu and devising strategies to serve the largest number of customers the highest quality food in the shortest time period.  Charles has continued to originate all aspects of Pearl since its opening a decade ago: adding to and deleting from its menu; creating and selecting all of its menu items and recipes; locating all its food purveyors; and developing and directing all aspects of food preparation and service at Pearl.

**The Fiduciary Obligations of The _Sous Chef_ and Culinary Positions Generally**

13.      The _sous chef_ of a restaurant holds a management position comparable to that of a senior level executive in a corporation.  He or she is the second in command of the restaurant.  The _sous chef_ is responsible to carry out the vision of the chef and maintain the high standard of service set by the chef in his or her absence.  The _sous chef_ does not have creative input.  But particularly in a small restaurant like Pearl, the _sous chef_ has access to all confidential and proprietary information about the restaurant, its cuisine, its operations, its staff, its staff compensation arrangements, its purveyors and its clients.  The _sous chef_ is in a position of trust and confidence that is fiduciary in every sense of the word.

4

14.    The position of *sous chef* is so sensitive, critical and difficult to fill that it is commonly accepted in the New York restaurant community that a *sous chef* should give an employer at least two months' advance notice of a departure.

15.    Numerous organizations of professional chefs have recognized the obligation to respect the intellectual property of other chefs.

16.    The International Association of Culinary Professionals Code of Professional Ethics, provides, among other things, that adherents should:

> "Accurately represent my professional training and qualifications and not knowingly aid, abet or suffer the misstatement of my training and qualifications by others."

> "Maintain the highest standards of accuracy and honesty in my dealings with colleagues and clients."

> "Respect the intellectual property rights of others and not knowingly use or appropriate for my own financial or professional advantage any recipe or other intellectual property belonging to another without the proper recognition."

17.    Similarly, the United States Personal Chef Association Code of Ethics Part II states in part:

> "I promise . . . 5. To respect the intellectual property of my peers by not copying, reproducing or in any other way utilizing their written or published materials as my own, even when this work has not been explicitly protected by copyright, patent, etc."

**McFarland's Employment at Pearl**

18.    McFarland began his employment at Pearl in 2000 as a line cook with the understanding that he would become *sous chef* in a matter of months.  Soon thereafter, Charles promoted McFarland to the position of *sous chef* at Pearl.

19.    In 2007, McFarland's position as *sous chef* at Pearl included a salary of $65,000, including full health and hospitalization benefits worth another $5,000, a month's paid vacation and limited use of a corporate credit card ($1,500 per year), among other things. Charles relied on McFarland to manage Pearl's operations in her absence.

20.    As the *sous chef* of Pearl, McFarland became privy to proprietary innovations extensively tested and developed over time by Charles, and used to achieve particular characteristics of Pearl's dishes and their appearance, and also learned completely secret information with respect to Pearl's recipes, staff, budget and cost of operations.  This is information he never would have had but for the trust and confidence reposed in him by Charles.

21.    On information and belief, McFarland well understood the confidential and proprietary nature of the information he obtained in his capacity as *sous chef* at Pearl and the duty of loyalty he owed to Pearl.

22.    On numerous occasions, McFarland said to Charles that he wanted to be a partner in Pearl.  On other occasions, McFarland suggested that Charles should open another Pearl location in Manhattan, which McFarland would run according to the Pearl formula and in the ownership of which he would have an equal interest.  Thus, after the noted food critic and author Gael Greene urged Charles in print "to clone Pearl on the Upper West Side," McFarland suggested that Charles and he form a partnership to do just that.

23.    On another occasion, McFarland made a threat.  He told another employee of Pearl that he "knew everything about the place," and he could open his own restaurant without Charles and "take everything."  In this respect alone, he has proven as good as his word.  McFarland has reproduced the second Pearl restaurant that he was refused.

24.    As more fully set forth below, defendant McFarland, in breach of his fiduciary duties of undivided loyalty, good faith and  fidelity, has misappropriated and is using the confidential knowledge he gained at Pearl and is exploiting and converting it to defendants' benefit at Ed's Lobster Bar.  He did and does so in breach of the fiduciary duties he owed as Pearl's *sous chef*.

25.    Defendants have copied Pearl so totally in Ed's Lobster Bar as to belie any claim of either independent development or functional necessity.  Although Ed's Lobster Bar has been open only since March 16, 2007, the public already is being confused by its striking similarity to Pearl in its food, in its design, in its concept and in its appearance.

26.    On information and belief, defendants are actively engaged in seeking at least one other location to open further copycat operations.  Defendants also may contemplate franchising the misappropriated Pearl concept.

**McFarland's Deceptions and Wrongful Conduct**

27.    In January, 2006, McFarland announced that he would be leaving Pearl.  The next day, he promised to stay on, provided that another individual would share the duties of the *sous chef* position.

28.    In late January, 2007, giving only one month's notice, McFarland quit.  McFarland announced that he would be opening his own restaurant.

29.   After his announcement, Charles asked McFarland, at least twice, point blank, if he would be "knocking off Pearl." McFarland assured her both times that he would not.

30.   Charles asked McFarland if he would try to "poach" the staff at Pearl. McFarland said it was "not his intention to do so."

31.   McFarland told Charles as well as other Pearl employees and customers close to Charles that he planned to open a "red sauce Italian" sea food restaurant. As Pearl does not serve this type of food, that meant that McFarland would be inventing and developing dishes and concepts other than those distinctive to Pearl. Charles wished him well and offered him help and advice with his new concept.

32.   On information and belief, McFarland purposely deceived Charles by these statements.

33.   Two months before he gave notice, on November 6, 2006, McFarland formed Ed's Lobster Bar LLC, the entity which owns Ed's Lobster Bar. A copy of the Secretary of State website information for the LLC is annexed as Exhibit B.

34.   On information and belief, even before his departure from Pearl, McFarland solicited Pearl employees to leave Pearl and join the staff of Ed's Lobster Bar. At least one has done so.

35.   On information and belief, McFarland also approached Pearl patrons, while still employed by Pearl, and at Pearl, to solicit their business for his competing restaurant.

36.   On information and belief, after his departure, McFarland entered Pearl in the early hours of the morning and took photographs of business documents in the restaurant on his cell phone.

37.   On information and belief, McFarland took advantage of his confidential knowledge of Pearl staff salaries to attempt to offer enticements for staff to leave Pearl to work at Ed's Lobster Bar, and continues to do so.

38.   On information and belief, McFarland has taken advantage of his knowledge of Pearl's arrangements with its suppliers and purveyors, not available to the general public, to contact those purveyors and obtain similar goods and pricing.

39.   On information and belief, McFarland told at least one purveyor that he had told Charles the precise nature of the restaurant he was opening, before he left Pearl's employment, and that she had endorsed his endeavor.  This statement was false and, on information and belief, was made both to encourage the purveyor to deal with McFarland and to conceal the copycat nature of Ed's Lobster Bar from Charles for as long as possible.

40.   On information and belief, McFarland, while still employed at Pearl, took time from his duties and responsibilities as *sous chef* to work on development of Ed's Lobster Bar.

41.   After his departure, McFarland continued to attempt to lure away Pearl employees, including by visiting Pearl when Charles was absent.  McFarland went downstairs to a non-public area where Pearl employees were doing prep work and asked them to leave Pearl and come work for him.  By letter sent on or about March 27, 2007, Charles asked McFarland to cease visiting Pearl when it was not open to the public and she was not present.  (Copy of the text of the March 27, 2007 letter is annexed as Exhibit C.)  Notwithstanding this, McFarland again returned to Pearl when it was closed to the public and continues to attempt to lure away Pearl employees, taking advantage of his confidential knowledge of the Pearl salary structure. Finally, as recently as early April, McFarland called a current Pearl employee, at Pearl, and solicited information about sources of foodstuffs and prices paid by Pearl to its suppliers.

## McFarland's Total Misappropriation of Pearl's Unique Combination of Elements

42.    Ed's Lobster Bar opened to the public on March 16, 2007, only six weeks after McFarland left Pearl's employ.  It is not an Italian-themed seafood restaurant.  It is the very copy of Pearl which McFarland said he was not opening.  Ed's Lobster Bar was not merely inspired by Pearl; to all appearances, it is Pearl.  McFarland has taken all of the proprietary information he learned as *sous chef* and misappropriated it.  McFarland's pirating of Pearl is complete down to the minutest details.  He has copied the menu, food purchase and preparation innovations and the décor, and also has exploited confidential information concerning Pearl's purveyors, staff and customers.

43.    McFarland's copying of Pearl is "shameless", to adopt one food writer's phrase. Ed's Lobster Bar copies each and every element of Pearl.  Ed's Lobster Bar's menu consists almost entirely of dishes created by Charles that currently appear or have appeared on the Pearl menu or which were prepared for special events while McFarland worked at Pearl.  On information and belief, Ed's Lobster Bar prepares and plates the dishes in the same manner as Charles does at Pearl.  Moreover, Ed's Lobster Bar serves Pearl's food in a virtually identical setting.  Ed's Lobster Bar totally mimics the look and feel of Pearl as well in its color scheme, eschewing of reservations, lighting, bar area, seating, service style, and streamlined menu and wine list.  Even the bathroom and wait stations at Ed's Lobster Bar are clones of Pearl's. Furthermore, Ed's Lobster Bar is located in close proximity to Pearl, less than a mile away, which further enhances the likelihood of attracting and confusing Pearl customers.  In short, defendants have opened "the clone" which famous food critic and author Gael Greene suggested Charles should open, without credit or compensation.  Photographs documenting the virtual identity between the décor and food of Pearl and Ed's Lobster Bar are attached as Exhibit D.  In

each comparison, the top or left hand image is Pearl; the bottom or right hand is Ed's Lobster Bar. The restaurants' virtually identical menus and wine lists appear in Exhibit E.

44.    On information and belief, McFarland has boasted to others of the extent to which he has copied Pearl, and also falsely has claimed credit for developing these features at Pearl. McFarland expressly claims credit for one dish stolen from Pearl, "Ed's Caesar Salad", a secret recipe of Charles's mother passed down to Charles, and fails to credit Pearl or Charles in any way for his copycat operation.

45.    On information and belief, in appearing before Manhattan Community Board No. 1 in or about mid-January, 2007, in connection with obtaining a liquor license, McFarland told the Community Board his new restaurant would be just like Pearl.

46.    On information and belief, he also told the Community Board he "ran Pearl for years."

47.    On information and belief, in seeking to promote his new restaurant, McFarland falsely told media covering New York City restaurants, including The New York Times, that he had been *chef de cuisine* at Pearl. The *chef de cuisine* ordinarily has input into the conceptual menu design; McFarland had no such responsibility as *sous chef* at Pearl.

48.    Ed's Lobster Bar opened roughly six weeks after McFarland left his employment at Pearl.

49.    On information and belief, it would not have been possible for Ed's Lobster Bar to have opened so quickly if McFarland had not, in breach of his fiduciary duties at Pearl, diverted time, effort and confidential knowledge from his employment at Pearl to work on development of Ed's Lobster Bar.

50.    On information and belief, it would not have been possible for Ed's Lobster Bar to have opened so quickly if McFarland independently had developed rather than misappropriated the décor, menu, layout and style of service for Ed's Lobster Bar.

51.    On various occasions, Andrew Rasiej has asked chef Charles to go into a restaurant business with him, based on Pearl. She declined.

52.    Defendants' conduct constitutes misappropriation of a corporate opportunity of Pearl to open additional restaurants or otherwise profit from the unique Pearl concept, in breach of McFarland's fiduciary duties to Pearl.

**McFarland's Copying Is Causing Consumer Confusion.**

53.    Notwithstanding his assurances to Charles, McFarland in fact has copied Pearl so closely and extensively that customers have been calling Pearl since Ed's Lobster Bar opened and asking if Pearl has opened a new location or if Charles is a partner in Ed's Lobster Bar.

54.    The culinary community on the Internet also has been calling attention to the striking similarities between the restaurants, as the following examples show:

- Post by Whit565 on chowhound, March 21, 5:53 P.M. "And it's not like this guy [McFarland] hasn't made this food before; he's been making THE EXACT SAME dishes at Pearl Oyster Bar for several years." "But the shock is that the place was designed and decorated to look exactly like Pearl Oyster Bar!  Rebecca Charles can't be a partner there, can she?  Does anyone know?"

- "To start with the interior completely mimics The Pearl Oyster Bar.  If I didn't know better this could easily assume that this was a second

franchise of the Pearl." "Ed did however manage to copy the look of the
Pearl right down to the coffee mugs." NYCFishmonger, March 22.

- Gayot.com, discussing "the famed Pearl Oyster Bar," then
describes Ed's Lobster Bar, "the SoHo seafood shack spin off from
former Pearl chef Ed McFarland."

- Gridskipper.com : "Ed's Lobster Bar has all the trappings one
might expect from a man who worked at Pearl for six years and, in words
of many *was* Pearl Oyster Bar, Chef Ed McFarland." "The real question
is, 'How does it compare with Pearl's?' and the answer is, well, 'It's
almost identical.'" [discussing the lobster roll] "A long marble bar, white-
washed walls and a chalk board, nothing new here." (photo caption)

- www.gothamist.com ". . .Ed doesn't stray far from the familiar.
His hearty lobster roll is virtually identical to the one served at Pearl . . . ."

- Post on gothamist by Hayley B., March 21, 12:26 p.m.: "Ed is not
serving anything that he didn't learn at Pearl. From its grey wainscoting
to the style of its wine list to every single item on the menu (except the
calamari), it is a clone of Pearl's."

- Post on yelp.com by Scott R on May 5, 2007: "Remember when
you used to need a dual tape deck to make a copy of an album vs. burning
a CD? And the copy wasn't quite as good as the original tape... Consider
Ed's Lobster Bar a copy of a great album. It's very good – you'll enjoy it
– but you know in the back of your mind that it's not as good as the
original (The original being Pearl Oyster Bar http://www.yelp.com/biz/...

– if they had named Ed's something like Earl's Oyster Barge, they could've saved on signage and stationery with a little alteration.")

• Most strikingly, on the website Mouthfuls, wingding at March 20, 11:46 p.m. dramatically demonstrates the consumer confusion being caused. In the middle of a string of posts about Ed's Lobster Bar, wingding has posted a review of Pearl.

• Just this month, in the June 14-20, 2007 issue of Time Out New York, there is a review of Ed's Lobster Bar that reads in pertinent part: "Chef Ed McFarland (Pearl Oyster Bar) takes on the city's shellfish-shack formula-pioneered at his old stomping ground at this tiny new Soho spot."

Copies of these items are annexed as Exhibit F.

55.   Ed's Lobster Bar has been open to the general public only since March 16, 2007, but already it is clear public confusion is arising as to whether it is affiliated with or sponsored by Pearl.

56.   Pearl received dozens of phone calls after Ed's Lobster Bar opened, inquiring whether it had opened a new branch, meaning Ed's Lobster Bar. The difference in name alone does not avoid confusion, as many famous chefs operate multiple restaurants under different names.

57.   Virtually every dish appearing on the menu for Ed's Lobster Bar, copy attached as Exhibit E, either appears on the Pearl menu now or appeared on the Pearl menu or was prepared by Pearl for special events during the time McFarland worked at Pearl. Twenty eight of the items on the current Ed's Lobster Bar menu are copied from the current Pearl menu. Another ten items on the Ed's Lobster Bar menu appeared on Pearl's menu in prior years while defendant

14

McFarland worked at Pearl. This is contrasted with only three items on Ed's Lobster Bar's menu that have never appeared on Pearl's menu: a hot dog roll ice cream sundae, fried calamari and broiled lobster with bread crumbs and garlic.

58. On information and belief, and significantly, the only dishes which were prepared by Charles and served at Pearl that have not been included on the Ed's Lobster Bar menu are those created by Charles which were no longer served at Pearl when McFarland worked there.

## FIRST CLAIM
### (False Designation of Origin—15 U.S.C. §1125 – Trade Dress – against all defendants)

59. The allegations of Paragraphs 1 to 58 are repeated and realleged as if set forth at length.

60. Ed's Lobster Bar LLC is engaged in the sale of services in interstate and international commerce.

61. The similarities of the respective trade dress of Pearl and Ed's Lobster Bar combine to create the same general overall impression.

62. Charles selected specific elements at Pearl to evoke the seashore modified to reflect the restaurant's Manhattan location.

63. These elements chosen by Charles have been expressed in a group of design and appearance characteristics to create a trade dress which is unique and recognizable to Pearl. They include:

### The Copied Space

a. Pearl's interior is long and narrow. In a city filled with a variety of restaurant layouts, sizes and shapes, defendants have selected a long, thin space almost exactly like Pearl's.

b.   Charles designed Pearl's signature seating area, a long bar with 20+ seats, to evoke a New England seashore restaurant, but added a touch of New York sophistication by adding a white marble countertop.  Defendants have done the same.

c.   Charles also used the signature long, white marble counter on the wall opposite the long bar, for the same reason, to maximize seating.  Defendants copied this second white marble counter, on the opposite wall as well.

d.   Charles spent weeks researching the particular chairs and barstools to be used at Pearl, to create an appearance which is elegant but unornamented in a traditional New England fashion.  Chair backs have a "wheat straw" design and are available from only one source.  The Pearl chairs, tables and stools are light enough to move easily, to encourage and allow ad hoc groupings.  This increases operational flexibility while promoting interaction among customers.  Defendants have purchased the same signature wheat back bar stools and matching chairs.

e.   Charles selected silver-colored pendant lights for above the Pearl bar, meant to evoke fisherman's lanterns.  Charles also placed a mirror behind the bar and uses a chalkboard for special information. Defendants also have silver-colored pendant lights above the copied bar, a mirror behind the bar and use a chalkboard for daily information.

f.   Charles chose a simple, silver-colored beer tap for simplicity and design and placed it at the center of the bar.  Defendants have done the same.

g.   Charles chose wood flooring to evoke turn-of-the-century summer beach homes of Maine.  Defendants chose similar wood flooring, stained the same color.

h.   Charles put signature bead board, or, wainscoting, around the entire Pearl dining room, waist high, also meant to evoke these summer beach homes.  Wainscoting is a common guest house feature in Maine.  Defendants have done the same.

i.   Charles specifically chose Pearl's color scheme to be reminiscent of the Maine beaches she grew up on: the rocks, sand, sea, beach grass, etc.  The dining room wainscoting is painted gray; the bathroom door and accents are painted sea grass green; the walls are cream/white; a brick wall is painted cream/white; and there are silver and silver-colored accents around the rooms.  Defendants use the same colors in exactly the same way.

j.   Charles had very specific long, thin cabinets, built and installed behind the bar to make the best use of the space.  Defendants installed the same wall cabinets in the same unique layout at Ed's Lobster Bar.

k.   The furniture and accents in the bathroom at Pearl were selected to look like a guest house bathroom on the New England coast.  Defendants have copied Pearl's bathroom down to the vanity.

l.   Charles put a window seat in the front window of Pearl out of necessity; there was no floor which would have allowed for more seating.  Defendants have copied the window seat and its placement not solely out of necessity but as a design element meant solely to copy Pearl.

m.   Pearl has silver double coat hooks under the bar.  Defendants have installed the same silver double coat hooks.

n.   Charles brought understated artwork referring to Maine and piscine themes.  Defendants have done the same.

o.  Pearl's dining room has a wait station consisting of two wheat straw back chairs next to a wooden cupboard painted the same color as the wainscoting and containing glassware, coffee mugs and condiments.  Ed's Lobster Bar's wait station is in the same location and has the same elements.

The Copied Service Style

p.  Charles purposefully chose to omit certain elements which suggest a "sophisticated" metropolitan restaurant at Pearl, such as expensive menus and wine lists changed daily or weekly; tablecloths, or other coverings; bartenders and busboys; designated hosts; reservations; large parties; host station; and uniformed staff with rigid staff assignment to particular responsibilities.  Ed's Lobster Bar has taken each of these aspects of Pearl's ambience.

q.  Charles determined to set each table or counter spot at Pearl in the same "pre-set" fashion: a cloth napkin, simply folded, with a knife and fork atop it; a packet of Westminster Oyster Crackers; and the menu/wind list "placard" menus, which Charles intended to speed up pre-service.  Defendants' place settings are the same, even to the pre-set Westminster Oyster Crackers.

r.  Charles maintains an air of informality and conviviality at Pearl, including by painstakingly choosing and training waiters who will have a particular personality that is suitable to high-volume, fast-paced business with a great deal of customer interaction. Defendants have imitated Pearl's service style in this respect.

s.  Charles set up the Pearl wait staff so that everyone handles all aspects of the dining experience, including greeting customers on arrival, seating, taking food and drink orders, making wine recommendations and serving and clearing the food and wine.  Defendants have copied this aspect of Pearl's service style.

18

      t.   Charles has worked hard to insure a large regular clientele at Pearl by encouraging her handpicked wait staff to recognize regular patrons; make sure they get their favorite seat and/or table; to know and have their drinks ready and waiting; and to know what dishes they prefer. This requires great aptitude on the part of the waiters but promotes customer comfort and therefore repeat business, as well as speeding up business to maximize covers. Ed's has mimicked this service style as well and has tried to steal nearly every waiter from Pearl.

### The Copied Menu and Presentation

      u.   Charles devised the recipes and has created and creates the arrangement and presentation of all dishes previously served and now served at Pearl. Defendants have copied these recipes, arrangements and presentations.

      v.   Charles modeled the shape and style of Pearl's menu and wine list after classic French bistro menus: tall and thin, with the food displayed in simple, broad categories, with a clear number for the price. Charles added lamination so that the menus could be reused. The short, easy-to-read menus allowed customers to make up their minds in under five minutes. Defendants' menus have the same look and feel.

      w.   To accompany the streamlined menus, Charles created a similarly streamlined wine list for Pearl. Only one of each varietal is offered, and the varietal name, rather than the vineyard name, is listed first. Defendants have done the same.

      x.   The menus at Pearl contain seasonal variation only of side dishes to underscore the primacy of the quality in ingredients and rigor and consistency in preparation as well as to maximize operational efficiency in the small kitchen. Such a static menu is rare in the business. Defendants have done the same.

y.   Pearl's blackboard denotes market fish and filets available; what small selection of sides is available that day; and the market price of other menu items.  Defendants have done the same.

z.   Charles' grandmother had a long standing tradition of placing doilies under plated dishes, which Charles' mother continued in her Maine (and New York) home. Charles chose to carry on that tradition at Pearl.  Defendants also place doilies under plated dishes.

Ed's Lobster Bar is located less than a mile from Pearl so that defendants can trade unfairly on their total plagiarism of Pearl, as detailed above.

64.   The copied elements of Pearl itemized in Paragraph 63 are not functional or intrinsic characteristics of a seafood restaurant.  Instead, taken together, in a unique combination, they define the Restaurant Identity of Pearl as a seafood restaurant.  As Exhibit G shows, other seafood restaurants need not and do not so closely resemble Pearl as Ed's Lobster Bar does.

65.   On information and belief, Ed's Lobster Bar intentionally was designed to simulate the décor, menu, layout and style of service distinctive to Pearl.  As The New Yorker Magazine wrote on June 11, 2007 about Ed's Lobster Bar: "The inconveniences of the original – an unaccommodating space, harried staff, the absence of overflow seating – are charming, in the way of an old beach house, but feel almost cynical in a new construction."

66.   Ed's Lobster Bar does not credit or compensate Pearl in any way for the distinctive elements that have been copied wholesale at Ed's Lobster Bar.

67.   Pearl did not authorize defendants to use the readily identifiable elements and cuisine of Pearl.

68. Defendants falsely make it appear that they, not Charles, created and implemented the dishes and restaurant concept embodied in Ed's Lobster Bar.

69. A customer who dined at Ed's Lobster Bar and at Pearl would not know that Charles and Pearl, not McFarland and Ed's Lobster Bar, are the originators of the dishes served and the concept of both restaurants.

70. Defendants' wholesale adoption of Pearl's décor, menu, dishes, layout, design and style of service constitutes a false designation of origin. On information and belief, it is intentionally designed to deceive and has deceived customers and prospective customers into believing that Ed's Lobster Bar is authorized, licensed, endorsed or sponsored by Pearl, when in fact it is not.

71. By reason of the foregoing, in connection with the sale of goods and services, defendants are likely to cause confusion or mistake or to deceive as to the affiliation, connection or association of plaintiff with Ed's Lobster Bar.

72. Plaintiff has no adequate remedy at law.

## SECOND CLAIM
### BREACH OF FIDUCIARY DUTY
### AND MISAPPROPRIATION OF
### CORPORATE OPPORTUNITY
### (against McFarland)

73. The allegations of Paragraphs 1 to 72 are repeated and realleged as if set forth at length.

74. As the *sous chef* of Pearl, employed in a position of trust and confidence, McFarland owed Pearl fiduciary duties of undivided loyalty, utmost good faith and complete honesty with respect to all matters affecting or potentially affecting Pearl, its culinary efforts, its intellectual property or its business affairs.

75.   These fiduciary duties existed throughout McFarland's employment at Pearl, and continued thereafter.

76.   McFarland falsely represented to Charles at the time of his departure that he did not intend to open a clone of Pearl.

77.   McFarland has opened a clone of Pearl in bad faith and contrary to his representations to Charles.

78.   Prior to and after his departure from Pearl, McFarland solicited Pearl's staff in breach of his fiduciary duties to plaintiff.

79.   Prior to his departure from Pearl, McFarland solicited Pearl's customers in breach of his fiduciary duties to plaintiff.

80.   Prior to his departure but after Charles refused his request to open a second Pearl in partnership with him, on information and belief, McFarland improperly solicited and secured financial and business support to create and operate a clone of Pearl.  McFarland concealed his disloyal acts until he had departed from Pearl.

81.   McFarland knew that Pearl operated pursuant to a detailed business plan, developed by Charles and modified and implemented over the years which, taken as a whole, was confidential, proprietary and of great value.

82.   McFarland misappropriated Pearl's unique combination of elements in breach of his fiduciary duties to plaintiff.

83.   By reason of the foregoing, both while at Pearl and since leaving Pearl, McFarland  has breached and continues to breach the fiduciary duties he owed and owes to Pearl.

84.    In particular, McFarland's wholesale appropriation of virtually every aspect of the cuisine, appearance, operation and presentation of Pearl and its Restaurant Identity is an egregious diversion to defendants' benefit of a corporate opportunity belonging to Pearl.

85.    Plaintiff has been injured as a result.

### THIRD CLAIM
### (COMMON LAW MISAPPROPRIATION/UNFAIR COMPETITION – Against all Defendants)

86.    The allegations of Paragraphs 1 to 85 are repeated and realleged as if set forth at length.

87.    Pearl has gone to great length, effort and expense over the past ten years to achieve the reputation it now enjoys.

88.    Pearl's goodwill and reputation is evidenced by the numerous favorable articles about Pearl that have been widely distributed in New York City, across the nation and even overseas.

89.    Defendants have imitated Pearl slavishly, in bad faith, in a nearby restaurant, as part of a scheme to seize for Defendants a reputation and business Ed's Lobster Bar otherwise could not have attracted.

90.    Pearl has a property right in its distinctive combination of design and culinary characteristics, its Restaurant Identity, as well as in its trade secrets.

91.    Defendants have deliberately competed and continue to compete against Pearl by unfair and wrongful means, as alleged above.

92.    Defendant McFarland was well aware of the confidential and proprietary nature of the Pearl combination of design and culinary features, having sought and been denied permission to use it.

93.   Defendants have misappropriated Pearl's proprietary rights, and thereby competed and compete unfairly with Pearl.  Plaintiff has been injured as a result.

## FOURTH CLAIM
### (NEW YORK GENERAL BUSINESS LAW §360-*l* – Against all Defendants)

94.   The allegations of paragraphs 1 to 93 are repeated and realleged as if set forth at length.

95.   As more fully averred above, plaintiff is the owner of distinctive trade dress which serves as a mark.

96.   Defendants, through their conduct described above, are diluting the value of plaintiff's trade dress.

97.   The trade dress of plaintiff and Ed's Lobster Bar are substantially similar.

98.   Plaintiff and Ed's Lobster Bar compete in the same market.

99.   The customers of plaintiff and Ed's Lobster Bar range from extremely sophisticated consumers to unsophisticated consumers.

100.   On information and belief, defendants acted in bad faith in purposefully pirating the trade dress of plaintiff.

101.   Plaintiff's trade dress is well known, but for a variety of reasons, it easily could be "blurred" and/or "tarnished" by Ed's Lobster Bar's copycat trade dress.

102.   It appears from various food blogs that some patrons of Ed's Lobster Bar have been disappointed by the quality of its food.  To the extent they mistakenly believe that Ed's Lobster Bar is authorized, licensed, endorsed or sponsored by Pearl, and associate that experience with plaintiff, owing to the confusion created by the virtually identical trade dress pirated by defendants, there is a grave risk of tarnishment of plaintiff's trade dress.

103.  As a result of the foregoing, plaintiff's business reputation is likely to suffer injury and the distinctive quality of its trade dress is likely to be diluted.

104.  Plaintiff has no adequate remedy at law.

## FIFTH CLAIM
## (TRADE SECRETS – against McFarland)

105.  The allegations of paragraphs 1 to 104 are repeated and realleged as if set forth at length.

106.  Pearl entrusted McFarland with specific secret information with respect to recipes, food preparation procedures and standards and business processes solely in order that he could perform his function as *sous chef* at Pearl, and wholly without any authorization to disclose same.

107.  McFarland improperly has disclosed to defendant Ed's Lobster Bar LLC, and improperly is using in connection with the operation of the restaurant Ed's Lobster Bar, this information which was a trade secret of Pearl

108.  Plaintiff has been injured as a result.

## SIXTH CLAIM
## (UNJUST ENRICHMENT- against all defendants)

109.  The allegations of Paragraphs 1 to 108 are repeated and realleged as if set forth at length.

110.  Defendants seek to take improper advantage of the substantial time, money and effort expended by Plaintiff in the creation and operation of Pearl without duly compensating plaintiff.

111.  It would be inequitable to permit them to retain the benefit therefrom without payment for its value.

112. Plaintiff has been injured as a result.

## SEVENTH CLAIM
### (PROMISSORY ESTOPPEL – against McFarland)

113. The allegations of Paragraph 1 to 112 are repeated and realleged as if set forth at length.

114. Plaintiff shared highly confidential information with McFarland on the understanding he would neither disclose it nor use it at another restaurant.

115. Plaintiff relied to its detriment upon McFarland's express or implicit promises.

116. Accordingly, McFarland should be estopped from the use of confidential information he obtained.

## EIGHTH CLAIM
### (IMPOSITION OF CONSTRUCTIVE TRUST – against all defendants)

117. The allegations of Paragraphs 1 to 116 are repeated and realleged as if set forth at length.

118. Defendant McFarland stood and stands in a fiduciary relationship with plaintiff.

119. Defendant Ed's Lobster Bar LLC, by reason of McFarland's sharing of the confidential and proprietary information of Pearl with it, also stands in a quasi-fiduciary relationship with Pearl.

120. The confidential and proprietary information possessed by McFarland would not have been transferred to him by Pearl except in reliance upon its confidential nature being maintained by him.

121. As the result of defendants' misconduct, they are being unjustly enriched. Accordingly, Pearl is entitled to the imposition of a constructive trust upon any proceeds

defendants realize as the result of their utilization of the improperly acquired confidential and proprietary information of Pearl.

122. Plaintiff has no adequate remedy at law.

## NINTH CLAIM
### [CONVERSION – against all defendants]

123. The allegations of Paragraphs 1 to 122 are repeated and realleged as if set forth at length.

124. Plaintiff had the right to the exclusive possession and enjoyment of the Restaurant Identity, the combination of restaurant décor, business and culinary ideas belonging to plaintiff and put into practice at Pearl.

125. Defendant McFarland had access to all of the confidential and proprietary restaurant ideas belonging to plaintiff put into practice at Pearl by virtue of his position as *sous chef*.

126. Defendant McFarland has assumed and exercised unauthorized ownership rights over the restaurant ideas belonging to plaintiff and put into practice at Pearl by copying the entirety of the Restaurant Identity belonging to plaintiff in a copycat restaurant named Ed's Lobster Bar.

127. Defendants intentionally have interfered with plaintiff's right to exclusive possession of the combination of ideas, the Restaurant Identity, put into practice by plaintiff at Pearl.

128. On information and belief, defendants' conduct was wanton, willful or malicious.

129. By reason of the foregoing, plaintiff has been damaged in its exclusive possession and enjoyment of its property.

## TENTH CLAIM
### (PRIMA FACIE TORT – against all defendants)

130. The allegations of Paragraphs 1 to 129 are repeated and realleged as if set forth at length.

131. To the extent that it is found that the foregoing is not actionable as any other known tort, the conduct of the defendants constitutes prima facie tort, in that they intentionally engaged in the conduct alleged above, that they did so without justification and that, on information and belief, they did so solely to harm the plaintiff.

132. Plaintiff has been injured as a result.

## ELEVENTH CLAIM
### (QUANTUM MERUIT – against all defendants)

133. The allegations of Paragraphs 1 to 132 are repeated and realleged as if set forth at length.

134. By reason of the foregoing, plaintiffs are entitled to receive from defendants the value derived by defendants through their misappropriations from Pearl.

## TWELFTH CLAIM
### (DECLARATORY RELIEF – against all defendants)

135. The allegations of Paragraphs 1 to 134 are repeated and realleged as if set forth at length.

136. There is an actual, justiciable controversy between plaintiff and the defendants. The intervention of the Court is required to declare the rights and other legal relations of the parties.

137. The conduct of defendants constitutes a false designation of origin; a theft and unauthorized disclosure and use of trade secrets; misappropriation and unfair competition; unjust enrichment of defendants; conversion; improper diversion of a corporate opportunity; and breach

of McFarland's fiduciary duties.  Moreover, McFarland's conduct should estop him from competing unfairly with plaintiff.

138.  There is a continuing actual and justiciable controversy between plaintiff and defendants.

WHEREFORE, plaintiff prays for entry of a judgment in plaintiff's favor as follows:

A.      Enjoining defendants from using in any way Pearl's distinctive trade dress so as to be likely to cause confusion, mistake or deception among consumers, at Ed's Lobster Bar or any other establishment, and from unfairly competing with plaintiff in any other manner;

B.      Enjoining defendants from any further disclosure, use and benefit from Pearl's recipes and restaurant concepts, including, without limitation, falsely making it appear that defendants, not Charles and Pearl, created and implemented the dishes and restaurant concepts presently being pirated wholesale at Ed's Lobster Bar;

C.      Awarding plaintiff such actual damages as plaintiff has or will have sustained at the time of judgment by reason of defendants' infringement of plaintiff's trade dress;

D.      Requiring defendants to account for and pay over to plaintiff all gains, profits and advantages derived by them from infringement of plaintiff's trade dress and defendants' unfair competition with plaintiff;

E.      Pursuant to 15 U.S.C. §1118, ordering that all symbols, devices or combinations thereof, and all reproductions, copies and colorable imitations of the subject matter of the violation of 18 U.S.C. §1125(a) asserted herein, be delivered up and destroyed;

F.      Enjoining defendants from using copies of such elements of Pearl's distinctive trade dress as are likely to blur or tarnish same;

G.    Awarding plaintiff actual and punitive damages against defendant McFarland for breach of fiduciary duties, the exact amounts to be determined at trial;

H.    In the alternative, requiring defendants to pay plaintiff an appropriate license fee;

I.    Imposing a constructive trust on the proceeds of the operation of Ed's Lobster Bar, and or any payment to McFarland from Ed Lobster's Bar LLC, whether as salary, equity, profit participation or otherwise, for use of confidential and proprietary information of Pearl improperly acquired;

J.    Declaring that:

(1) defendants have used false descriptions of origin likely to cause confusion between Pearl and Ed's Lobster Bar;

(2) defendant McFarland has breached his fiduciary duties to Pearl;

(3) defendants have misappropriated trade secrets and corporate opportunity from Pearl;

(4) defendant McFarland has made unauthorized and improper disclosures to Ed's Lobster Bar LLC of confidential and proprietary information belonging to Pearl;

(5) defendants have competed unfairly with Pearl;

(6) defendants have converted Pearl's property; and

(7) defendants have been unjustly enriched.

K.    Awarding plaintiff its costs and disbursements in this action;

L.    Awarding plaintiff its reasonable attorney's fees in this action; and

M.    Granting such other and further relief in plaintiff's favor as may be just.

Yours, etc.,

SCHIFF HARDIN LLP

Dated: New York, New York
      June 25, 2007

By: _____
      David Jacoby
      A Member of the Firm
      900 Third Avenue
Of Counsel:
Judith S. Roth
      New York, NY 10022
      (212) 753-5000
      Attorneys for Plaintiff Powerful Katinka, Inc.

NY\ 5126198.9